### UNITED STATES of America

### v.

### Stephen TRAITZ, Jr., Mark "Buddy" Osborne, Robert Medina.

### Crim. A. Nos. 86–00451–01, 86–00451–07 and 86–00451–08.

United States District Court, E.D. Pennsylvania.

Nov. 4, 1986.

Edward S.G. Dennis, U.S. Atty. by Ronald Noble and Richard Scheff, Asst. U.S. Attys., Philadelphia, Pa., for Government.

Ronald F. Kidd, Philadelphia, Pa., for Stephen Traitz, Jr.

Steven Morley, Philadelphia, Pa., for Mark Osborne.

Saul Doner, Philadelphia, Pa., for Robert Medina.

### MEMORANDUM AND ORDER

KATZ, District Judge.

Three defendants seek review in this Court of the Magistrate's detention order.[1] The issue before me is whether "no condition or combination of conditions will reasonably assure ... the safety of any other person and the community."[2] The facts on

---

1. 18 U.S.C.A. § 3145(b) (West 1985). The Magistrate's Findings and Order of Detention dated October 27, 1986 followed an evidenciary hearing.

2. 18 U.S.C.A. § 3142(e) (West 1985).

which I base that finding must be supported by clear and convincing evidence.[3]

The indictment charges numerous offenses.[4] For present purposes, the government relies on two types of charges: union violence and obstruction of justice. The union violence involved shaking down roofing contractors. The obstruction of justice included taking kickbacks from two lawyers who operated a prepaid legal fund for union members for the purpose of creating a cash fund to "fix" state court judges and employees.

The union violence charges are that Traitz organized, Medina supervised, and Osborne carried out a scheme to force roofers to make monthly payments to the union by intimidation. Stephen Traitz, Jr. is the chief executive officer of the Roofers Union. Traitz directed the union's financial affairs, assignments of lower ranking officials and relationships between the union and public officials. Robert Medina was a business agent of the Roofers Union until March, 1986. Medina's role in the union involved the summoning of union contractors to the union officers where they were confronted by Medina, Mark Osborne, and others. These confrontations concerned alleged debts owed to the union, demands to pay money in the future and infractions of union rules. These confrontations included shouting accusations of wrongdoing, threats of physical harm and loss of business, slapping and physical abuse. These confrontations took place in a room where the contractor was confronted by a group of union agents. Defendant Medina handled some of the confrontations and was the primary speaker. Defendant Osborne participated in three of the confrontations which included two instances where he assaulted the victim. Stephen Traitz, Jr. was alleged to have orchestrated the demands to the contractors. The central demands were that roofing contractors pay $60 each month to the union on the basis of a report that they worked at least 100 hours each month, whether they actually worked that number of hours or not. The Indictment charges Traitz told Medina that the demands to roofing contractors to report 100 hours each month was a "hustle." [5]

The obstruction of justice charges are that Traitz led a plot to create a cash fund

---

3. 18 U.S.C.A. § 3142(f) (West 1985).

4. On October 23, 1986, the grand jury returned a 61 count indictment charging nineteen persons with offenses including participation in the affairs of the Roofers Union, an enterprise engaged in an industry affecting commerce, through a pattern of racketeering and conspiracy to do so (RICO) in violation of Title 18, United States Code, §§ 1962 and 1963. (Counts One and Two). The predicate offenses for the RICO included state law bribery, bribery of a federal official, 18 U.S.C. § 201, embezzlement of union funds, 29 U.S.C. § 501(c), embezzlement of funds from an employee welfare benefit plan, 18 U.S.C. § 664, solicitation and acceptance of kickbacks to influence the operation of an employee benefit plan, 18 U.S.C. § 1954, mail fraud, 18 U.S.C. § 1341, interference with commerce by extortion, 18 U.S.C. § 1951, and collections of credit by extortionate means, 18 U.S.C. § 894. In addition, the indictment charges violations of 18 U.S.C. § 1952, interstate travel in aide of racketeering. The charges in the indictment are:

| Charge | Counts |
| --- | --- |
| 1. RICO conspiracy | 1 |
| 2. RICO | 2 |

| Charge | Counts |
| --- | --- |
| 3. Mail Fraud, 18 U.S.C. § 1341 | 3–10 |
| 4. Solicitation and Acceptance of Kickbacks To Influence Operation of Employee Benefit Plan, 18 U.S.C. § 1954 | 11–16 |
| 5. Embezzlement of Funds From An Employee, 18 U.S.C. § 664; Welfare Benefit Plan, 18 U.S.C. § 664 | 17–19 |
| 6. Bribery of a Federal Official, 18 U.S.C. § 201(b) | 20–23 |
| 7. Interference With Commerce By Extortion, 18 U.S.C. § 1951 | 24–39 |
| 8. Collections of Credit by Extortionate Means, 18 U.S.C. § 894(a) | 40–57 |
| 9. Interstate Travel in Aid of Racketeering, 18 U.S.C. § 1952 | 58–60 |
| 10. Embezzlement of Union Funds, 29 U.S.C. § 501(c) | 61 |

The defendants seeking review of the Magistrate's detention order are charged in the following counts of the indictment:
1. Stephen Traitz, Jr.: 1–13, 17–19, 20–23, 40, 41, 60, 61.
2. Mark Osborne: 1, 2, 26, 36, 38, 45, 54, 56.
3. Robert Medina: 1–10, 24–39, 43–57.

5. Indictment at 21, Overt Act 30.

from kickbacks, which he used to pay off persons in the state court system to influence their decisions in favor of roofing union members, including Medina.

Stephen Traitz, Jr. also is charged in the indictment with masterminding a scheme to embezzle money from the union and its Prepaid Legal Fund by funnelling money through a law firm and receiving kickbacks. This money was used to give cash to federal, state and local public officials including state court Judges, court personnel, labor officials, police officers, prison officials and others. The indictment alleges that the cash was given to influence the officials in the performance of their official duties. Traitz intended to curry favor with state court judges to be able to influence them when persons affiliated or associated with the Roofers Union appeared as a defendant in a criminal case. For example, overt acts listed in furtherance of the RICO conspiracy involve discussions of efforts to "fix" cases and intentions to do so. One such case concerned local charges of aggravated assault against Robert Medina arising out of a traffic accident in which he was involved. The insurance claim concerning the automobile which Medina was driving at the time forms the basis for the mail fraud charges.

■ The weight of the evidence against defendants is difficult to evaluate with full confidence at this stage. The government has the results on tape of 150 days of electronic surveillance of the union headquarters between September 26, 1985 and February 20, 1986. I will evaluate the evidence regarding the violence, the obstruction of justice and, most importantly, intimidation of witnesses.[6] Defendants who, based on their past conduct of threatening witnesses, may intimidate witnesses must be detained. *United States v. Delker*, 757 F.2d 1390, 1401 (3d Cir.1985). As the Court stated in *United States v. Coleman*, 777 F.2d 888, 894 (3d Cir.1985):

"... defendants who have threatened witnesses pose a significant danger and should be detained prior to trial."

The government has demonstrated that the three defendants under detention used the roofers' union to squeeze money out of roofing contractors by violence and intimidation. The tape recorded conversations demonstrate that the Roofers Union has conducted its affairs through a pattern of violence. On October 30, 1985, Stephen Traitz, Jr., Robert Medina, and another defendant discussed an individual who worked for Peerless Roofing. When Medina advised Traitz that the individual had not followed certain instructions, Traitz instructed Medina to have the individual beaten. Traitz advised Medina not to get involved personally in the beating. Traitz instructed Medina to get a "good gang" together and "give it to 'em good." Traitz instructed Medina that a "good punch in the mouth will do him a world of good." There is no evidence that this assault actually occurred.

On November 21, 1985, Stephen Traitz, Jr., after having been informed that a particular individual was in a dispute, instructed Mark Osborne, and other defendants to "back hand" the individual, but "don't punch him now" because he "hurt his head." This assault was to occur in the union offices. This assault did not occur because the individual did not come to the union offices as instructed.

In a December 10, 1985, conversation, Stephen Traitz, Jr. spoke of instructing other defendants to assault another union's business agent, if the individual did not accede to Traitz's request. There is no evidence that the assault took place. Traitz stated, "The first time I see him at one of them functions, I'll get Joey or Schoenberger to beat the fuckin' balls off him. Like I did with the two metal men, like I did with the ironworker, like I did with the bricklayer. That's how I do it.

---

6. I have also reviewed the transcripts of the October 27, 1986 Magistrate's hearing. I am evaluating the evidence on the record before me for present purposes as I am required to do. I may change my mind when I hear more evidence.

They're scared to fuckin' death of me because that's how the fuckin' operate."

Other conversations are proffered to indicate that on October 17, 1985, Stephen Traitz, Jr. told another defendant to summon a roofer to the union offices for a union infraction and to let defendant Joseph Traitz "give him a smack." On October 23, 1985, Traitz gave permission to a defendant to assault a roofer over a personal matter, according to another proffer in the government's Memorandum. Finally, on November 7, 1985, the government's Memorandum proffers that Traitz told another defendant what he (Traitz) tells other business agents to tell contractors to establish superiority. Specifically, Traitz stated, "If you fuck me, I'll beat you the fuck-up. Don't mess with me ... I'll beat you up."

Stephen Traitz, Jr. does not perform the acts of violence personally. Rather, this task falls on one or more of his subordinates. The recorded conversation of October 10, 1985 is replete with evidence of this; it also suggests some connection between the union and a reputed organized crime employee.

In an October 3, 1985, tape recording, a contractor who tried to leave a confrontation at the union offices was forced to sit down for further intimidation. On November 21, 1985, another contractor was at the union offices for a confrontation. In that instance, Robert Medina was intercepted yelling "smack him in the mouth. Smack him again ... smack him again." This was followed by slapping noises. The tape recording established that Mark Osborne was the individual who actually assaulted the contractor. Similarly, there is a tape recording from a November 26, 1985 assault of a roofer. In that confrontation, Mark Osborne slapped a roofer in the union offices for working on weekends. In yet another instance on September 26, 1985, Robert Medina and others confronted a contractor and accused him of underreporting the number of hours worked. In this confrontation, Robert Medina screamed and yelled at the contractor. At one point, the contractor is slapped on the side of the head by another defendant. At the end of this confrontation directed by Robert Medina, another defendant told the contractor, "You're lucky you're getting away with just a slap in the head; next time it won't be as easy."

In fairness to the defendants, it is difficult to evaluate on the present record a defense claim suggested at the Magistrate's hearing that the violence was used to achieve legitimate union objectives. *See* *U.S. v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). Suffice it to say that, while I am not prejudging such a defense, its factual underpinnings on the present record appear weak. Correspondence dated September 13, 1985 between the union and its attorneys suggesting contract language that roofers report and pay on the basis of a specified minimum number of hours per month does not appear to explain or justify the beatings recorded by the government.[7]

The evidence regarding these defendants' obstructing justice and intimidating witnesses demonstrates a clear intention to "fix" state court judges, but a weak showing of intimidation or threats to witnesses in a judicial proceeding. On October 16, 1985, Robert Medina was arrested by Philadelphia police officers for aggravated assault with a motor vehicle and related charges. The charges arose from a motor vehicle accident which occurred on June 21, 1985, between Medina and a 17 year old driver. Medina allegedly fled from the scene of the accident and drove to a cul-de-sac in Northeast Philadelphia. The 17 year old driver of the other vehicle followed Medina to the cul-de-sac and left his vehicle to speak with Medina. Medina then attempted to hit the youth with his vehicle by driving towards him. The youth was hit on the hand.

---

**7.** In a recorded conversation on October 10, 1985, Traitz said, "I got all fist-fighters ... and the Hobbs Act puts me the fuck away, but yo if they know you're in back of me, I'm un-fuckin' beatable." He was talking to defendant Joseph.

A Federal grand jury subpoena was served on the office manager of the Roofers Union who had submitted an insurance claim for the vehicle claiming it had been stolen. This claim was initiated by Stephen Traitz, Jr. On October 4, 1985, following the service of the subpoena, Traitz and Medina discussed the traffic accident. During the conversation, both Traitz and Medina admitted that Medina had been in the accident and fled from the scene. Medina further admitted that he had been intoxicated at the time and had a gun in the motor vehicle. The evening before the preliminary hearing in the case, Stephen Traitz, Jr., on behalf of the Roofers Union contributed $1,000 to the Judge to whom the case was assigned. At the preliminary hearing, all felony charges against Medina were dismissed. The case was scheduled for trial on November 26, 1985.

On November 1, 1985, a conversation was tape recorded between Stephen Traitz, Jr. and Robert Medina concerning the juvenile witnesses in the case. Showing Medina a piece of paper with the names and addresses of the victims, Traitz and Medina had the following conversations:

TRAITZ: Yeah, I got all their names and addresses.

MEDINA: Yea. That's what he's afraid of, the lawyer.

TRAITZ: Yeah. That's okay. We'll let it go. Let it go down the pike. (UI) They'll get more than they fuckin' bargained for.

MEDINA: You know who's doin' all this, don't you Steve? It's not the kids ...

TRAITZ: The FBI's doin' it.

MEDINA: It's the FBI and that fuckin' cop.

TRAITZ: Nah, they're usin' Ebner.

MEDINA: All right.

TRAITZ: They're usin' him. Don't worry ...yo!

MEDINA: Them kids are young. Who the fuck ...

TRAITZ: I want to kick'em in the fuckin' balls.

MEDINA: All right. Whatever.

TRAITZ: Yeah, I want to kick'em in the fuckin' balls, Bobby.

MEDINA: All right.

TRAITZ: Them mother fuckers!

Upon hearing this conversation, the FBI informed a Philadelphia homicide detective, who was related to a witness, of Traitz's intention and requested that he telephone Traitz to discuss the matter. Traitz's half of that conversation was intercepted. During the conversation, Traitz denies that he ever would retaliate against witnesses. A conversation between Traitz and Osborne on October 30, 1985, shows the ability of these defendants to obtain names and addresses of persons who are intended victims or targets of beatings. In that conversation, Traitz instructed Osborne to beat up an individual. Osborne responded that he would find out where the individual's shop was because he had written down the individual's license plate number. The conversation then shifted to a discussion of the person from whom they obtained names and addresses for license plate numbers and their desire to solidify an ongoing relationship whereby the person would be paid monthly to perform the task. By independent investigation and review of other tape recorded conversations, the government claims that the person was a Philadelphia police officer.

On November 26, 1985, the day of the trial, Traitz and Medina had a conversation concerning the fact that the case had been continued to January, 1986. Traitz stated that "his guy (the Judge) failed him" and that he had witnesses for Medina in the courtroom prepared to testify in Medina's behalf. On December 5, 1985, Traitz, in effect told Medina to lie about his drinking at the time of the accident.

The only evidence of a threat to witnesses in a judicial proceeding is Traitz's "I want to kick 'em in the fuckin' balls" statement. When confronted about this by the witness' relative who was a detective, Traitz backed off.

Traitz and Osborne have never been convicted of a crime. Medina was convicted of armed bank robbery in 1957 for which he

was sentenced to 7 to 15 years and again of armed bank robbery in 1970 and 1971 for which he was sentenced to 20 years and paroled. He was also convicted of assault and related charges in 1986 for which he received probation in the Philadelphia Court of Common Pleas. There is no evidence of a serious risk that defendants will flee; the government does not seek detention on this ground.

Traitz has suggested conditions for release as follows [8]:

1. Defendant will post 10% of $200,-000 bail and allow his farm and home in Montgomery County to be used to satisfy the remainder of said bail in the event that the defendant breaches any conditions set by the Court.

2. Defendant agrees to cease and desist all Union activity until his case is decided.

3. Defendant agrees to 24 hour phone monitoring of his house phones. He further agrees to make no telephone calls to anyone outside his immediate family, attorneys and friends having no relation to the allegations of the captioned indictment.

4. Defendant agrees to remain on his farm in Montgomery County.

5. Defendant agrees to cease all personal contact with all but family members, attorneys and friends having no relation to the allegations in this case.

6. Defendant will surrender all firearms.

7. Defendant will comply with any other condition this Court deems necessary to secure his release.

Medina has suggested conditions for release as follows [9]:

1. Defendant will post 10% of $100,-000 bail and allow his home in Westville, Camden County, New Jersey, to be used to satisfy the remainder of said bail in the event that the defendant breaches any condition set by the Court.

2. Defendant agrees to cease and desist all Union activity, and has refrained from any such activity since March of 1986, and will continue to so refrain, until his case is decided.

3. Defendant agrees to remain at his home in Westville, Camden County, New Jersey.

4. Defendant agrees to cease all personal contact with all but family members, attorneys and friends having no relation to the allegations in this case.

5. Defendant will surrender all firearms.

6. Defendant will comply with any other condition this Court deems necessary to secure his release.

Osborne contends that a long detention will impede his counsel's meeting with him to prepare a defense. However, claims based on the anticipated duration of pretrial incarceration are premature in the context of this case. *U.S. v. Accetturo*, 783 F.2d 382, 388 (3d Cir.1986).

The issue then is whether the government has shown by clear and convincing evidence that no set of release conditions will reasonably assure the safety of witnesses and the community. *U.S. v. Orta*, 760 F.2d 887, 891 (8th Cir.1985). Prohibiting these defendants from associating with co-defendants would not prevent them from meeting with others who are members of a criminal enterprise or corrupting others to do their bidding. *U.S. Colombo*, 777 F.2d 96, 100 (2nd Cir.1985). I recognize that some of the government's witnesses are in fear because of these defendants' past violence and reputation for violence.

■ However, to detain defendants because of their past violence and reputation for violence where there is reasonable assurance that the violence and threats will cease would violate the statute. 18 U.S.C. § 3142(f). Moreover, to detain defendants where witnesses are afraid, but there is no evidence that defendants have threatened

---

**8.** Traitz's Motion For Review of A Detention Order, Exhibit B.

**9.** Medina's Motion For Review of a Detention Order, Exhibit B.

or harmed any witness in the past and there is reasonable assurance that they will not do so in the future would go beyond any precedent of which I am aware. The Magistrate's conclusory findings, while completely understandable in view of the time pressure he faced, do not analyze the factors on which a detention order must be based. *U.S. v. Coleman*, 777 F.2d 888, 892 (3d Cir.1985). More importantly, the Magistrate apparently did not have an opportunity to consider the suggested conditions for release.

The government opposes the "house arrest" conditions because of the risk that defendants could corrupt friends or family having no relation to the conduct in the indictment to do their bidding. There is that risk. It is a risk that exists even if defendants remain in jail. Even with these defendants in jail, witnesses are afraid. Their fear includes "that they wouldn't be able to get men or get work." [10]

The government contends that Traitz's proposal of 24 hour telephone monitoring is impracticable because of its resource limitations. However, with Traitz's consent to 24 hour telephone monitoring on the record, presumably the government could accomplish random monitoring, within its limited resources, to accomplish the objectives of surveillance and control.

■ More significantly, Stephen Traitz, Jr. is now out of the union business. As of today, he shall cease and desist all union activity until further Order of this Court. This does not guarantee community safety. But the law does not permit me to impose conditions which will guarantee community safety. *U.S. v. Orta, supra*, at 891. Based on the record before me, I find that Traitz's removal from union activities combined with the other conditions in my Order provide reasonable assurance that the pattern of violence against roofing contractors and others will cease. I will impose the same conditions against union activity on Medina and Osborne which, in conjunction with removal of Traitz from a union leader-

ship role, provide reasonable assurance of community safety from them.

My most serious concern is the protection of witnesses in this case from intimidation or violence. The evidence before me shows a single threat to juvenile witnesses in a prior case "...to kick 'em in the fuckin' balls." This threat was in a monitored conversation at the union's office. When confronted about this threat, Traitz denied that he would retaliate in an intercepted telphone conversation with the juvenile's relative who was a detective. With the conditions I am imposing, I find that there is reasonable assurance of the safety of witnesses and other persons. I believe that the one "threat" to a witness in the record was vulgar street talk, not action language.

If my judgment proves to be mistaken, the government should move to revoke defendants' bail. Releasing these three defendants is not risk free. Neither is the presumption of innocence. 18 U.S.C. § 3142(j).

Weighing the importance of the interests involved and the difficulty and closeness of the case, I will stay my Order for twenty four hours after its receipt by the government attorney, so that the government may decide whether to exercise its right to appeal. I will further stay my Order pending determination of an appeal, so that the government can obtain meaningful appellate review of my decision, if it wishes. *U.S. v. Coleman, supra*, at 891.

### ORDER

AND NOW, this 4th day of November, 1986, after a hearing on November 3, 1986, it is ORDERED that defendant, STEPHEN TRAITZ, JR., shall be released from custody on the following conditions:

1. Defendant will post 10% of $400,000 bail and post good title to his farm and home in Montgomery County, the property in Trooper and his farm in Tioga County, including all personal property contents (including horses) of the home and farms, for

---

**10.** Magistrate Transcript at 135.

his appearance and to be used to satisfy the remainder of said bail in the event that the defendant breaches any conditions set by the Court. The liens and security interests shall be recorded under supervision of the U.S. Attorney.

2. Defendant shall forthwith cease and desist all union activity directly or indirectly until further Order of this Court.

3. Defendant agrees to 24 hour phone monitoring of his house phones, and to wear a beeper device to disclose his whereabouts, if requested by the government. He further agrees to make no telephone calls to anyone outside his immediate family, attorneys and friends having no relation to the allegations of the captioned indictment.

4. Defendant agrees to remain on his farm in Montgomery County, subject to house arrest and report by telephone daily to the Pretrial Services Officer.

5. Defendant agrees to cease all personal contact with all but family members, attorneys and friends having no relation to the allegations in this case.

6. Defendant will surrender all firearms and his passport.

7. Defendant will comply with any other condition this Court deems necessary in the future to continue his release.

Defendant is advised as follows:

1. The penalties for violating a condition of release shall include revocation of this Order and bail, punishment for contempt of Court and the mandatory penalties of imprisonment for committing an offense while on pretrial release.

2. The consequences of violating a condition of release include the immediate issuance of an arrest warrant.

3. Federal law provides severe penalties in 18 U.S.C. § 1503 for intimidation of witnesses, jurors and officers of the Court; in 18 U.S.C. § 1510 for obstruction of criminal investigations; in 18 U.S.C. § 1512 for tampering with a witness, victim or an informant; and in 18 U.S.C. § 1513 for retaliating against a witness, victim, or an informant.

This Order is hereby stayed for twenty-four hours after its receipt by the government attorney and, if the government appeals, pending determination of that appeal by the United States Court of Appeals for the Third Circuit. However, my Order that defendant shall forthwith cease and desist all union activity until further Order of this Court is not stayed. Nor are the following further conditions of release: defendant shall file with the Clerk forthwith an affidavit certifying that he has read a copy of this Order, agrees to be bound by the stated conditions of release and that he understands the three paragraphs above in which he is advised of the penalties and consequences of violating this Order.

### ORDER

AND NOW, this 4th day of November, 1986, after a hearing on November 3, 1986, it is ORDERED that defendant, MARK OSBORNE, shall be released from custody on the following conditions:

1. Defendant will post 10% of $100,000 bail and post good title to his home located at 9465 Woodbridge Road, Philadelphia, PA, for his appearance and to be used to satisfy the remainder of said bail in the event that the defendant breaches any conditions set by the Court. The lien shall be recorded under supervision of the U.S. Attorney.

2. Defendant shall forthwith cease and desist all union activity directly or indirectly until further Order of this Court.

3. Defendant shall remain at his home located at 9465 Woodbrige Road, Philadelphia, PA, subject to house arrest and report by telephone daily to the Pretrial Services Officer.

4. Defendant shall cease all personal contact with all but family members, attorneys and friends having no relation to the allegations in this case.

5. Defendant will surrender all firearms.

6. Defendant shall report by telephone daily to the Pretrial Services Officer.

7. Defendant will comply with any other condition this Court deems necessary in the future to continue his release.

Defendant is advised as follows:

1. The penalties for violating a condition of release shall include revocation of this Order and bail, punishment for contempt of Court and the mandatory penalties of imprisonment for committing an offense while on pretrial release.

2. The consequences of violating a condition of release include the immediate issuance of an arrest warrant.

3. Federal law provides severe penalties in 18 U.S.C. § 1503 for intimidation of witnesses, jurors and officers of the Court; in 18 U.S.C. § 1510 for obstruction of criminal investigations; in 18 U.S.C. § 1512 for tampering with a witness, victim or an informant; and in 18 U.S.C. § 1513 for retaliating against a witness, victim, or an informant.

This Order is hereby stayed for twenty-four hours after its receipt by the government attorney and, if the government appeals, pending determination of that appeal by the United States Court of Appeals for the Third Circuit. However, my Order that defendant shall forthwith cease and desist all union activity until further Order of this Court is not stayed. Nor are the following further conditions of release: defendant shall file with the Clerk forthwith an affidavit certifying that he has read a copy of this Order, agrees to be bound by the stated conditions of release and that he understands the three paragraphs above in which he is advised of the penalties and consequences of violating this Order.