UNITED STATES of America,
Appellant,

v.

Stephen TRAITZ, Jr.

UNITED STATES of America,
Appellant,

v.

Mark "Buddy" OSBORN.

UNITED STATES of America,
Appellant,

v.

Robert MEDINA.

Nos. 86–1676, 86–1677, and 86–1678.

United States Court of Appeals,
Third Circuit.

Argued Nov. 20, 1986.

Decided Dec. 1, 1986.

Henry L. Doner, Saul Doner, Saul Doner & Associates, Philadelphia, Pa., for appellee Robert Medina.

Steven A. Morley (argued), Morley & Farber, Philadelphia, Pa., for appellee, Mark "Buddy" Osborn.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Richard L. Scheff (argued), Ronald K. Noble (argued), Asst. U.S. Attys., U.S. Atty's Office, Philadelphia, Pa., for appellant.

Ronald F. Kidd (argued), Michael M. Mustokoff, Teresa N. Cavenagh, Duane, Morris & Heckscher, Philadelphia, Pa., for appellees, Stephen Traitz, Jr. and Robert Medina.

Before SEITZ, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The government appeals from orders of the district court releasing from custody defendants Stephen Traitz, Jr., Mark Osborn, and Robert Medina on certain conditions of release imposed by the court. The government contends that the release conditions are unsatisfactory and that no condition or combination of conditions will reasonably assure the safety of any other person or the community. We heard this appeal on an expedited basis.

Defendants Traitz, Osborn and Medina are among 19 defendants charged in a 61 count indictment with numerous offenses. All three defendants are charged with participation in the affairs of the Roofers Union through a pattern of racketeering and with conspiracy in violation of 18 U.S.C. § 1962 and collection of credit by extortionate means in violation of 18 U.S.C. § 894. Traitz and Medina are charged with mail fraud in violation of 18 U.S.C. § 1341.

Traitz is charged as well with solicitation and acceptance of kickbacks to influence operation of an employee benefit plan, in violation of 18 U.S.C. § 1954; embezzlement of funds from an employee welfare benefit plan in violation of 18 U.S.C. § 664; bribery of a federal official in violation of 18 U.S.C. § 201; interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952; and embezzlement of union funds in violation of 29 U.S.C. § 501(c). Osborn and Medina are also charged with interference with commerce by extortion in violation of 18 U.S.C. § 1951.

The government sought detention of the three defendants before trial pursuant to 18 U.S.C. § 3142. Following a consolidated detention hearing, a United States magistrate found that the defendants are charged, *inter alia*, with crimes of violence; that there is probable cause to find that each of the defendants is guilty of the crimes charged; that the evidence against Traitz, Medina and Osborn is substantial and incriminating; that tape recordings contain evidence that Traitz counselled and encouraged violence against roofing contractors and that Medina and Osborn actually committed intimidation and violence; that the tapes disclose repeated patterns of lawlessness and attempted obstruction of justice by intimidation; and that there is clear and convincing evidence that no condition or set of conditions will insure the safety of the community and the witnesses and protection of the witnesses in this case if these defendants were released.

Following an appeal to the district court, a hearing was held on November 3, 1986. The district court reversed the Magistrate's detention order and, in an order dated November 4, 1986, 646 F.Supp. 1086, directed that the defendants be released before trial under various conditions. These conditions require that each defendant post monetary bail in the amount of 10% of $400,000 for Traitz and $100,000 for the other two; that each post the title to his home, and in the case of Traitz title as well to other real and personal property, to assure each defend-

ant's appearance and to satisfy the remainder of his bail in the event he breaches any conditions set by the court; that defendants cease and desist all union activity directly or indirectly; that defendants remain at their respective homes subject to house arrest and report by telephone daily to the pretrial services officer; that defendants cease contact with all but family members, attorney and friends having no relation to the allegations in this case; that defendants surrender all firearms; and that defendants comply with any other conditions the court imposes. In addition, the court directed that Traitz agree to a 24 hour phone monitoring of his house phones, to wear a beeper device to disclose his whereabouts if requested by the government, and to surrender his passport.

The cases in which pretrial detention is authorized under the Bail Reform Act of 1984 are specified in 18 U.S.C. § 3142(f). *See* S.Rep. No. 225, 98th Cong., 2d Sess. 20, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3203. Here, the government alleges that the defendants have been charged with crimes of violence within 18 U.S.C. § 3142(f)(1)(A); that there is a serious risk that Traitz will obstruct and attempt to obstruct justice or intimidate witnesses, within the scope of 18 U.S.C. § 3142(f)(2)(B); and that Medina's prior offenses fall within 18 U.S.C. § 3142(f)(1)(D). Defendants do not appear to contest that this is the type of case in which pretrial detention could be ordered, and instead have challenged the government's contention that such detention is appropriate here.

Under the statute, pretrial detention can be ordered only when a judicial officer finds, after a hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The statute requires that in determining whether there are conditions of release that will reasonably assure such appear-

ance and safety, the judicial officer shall take into account the available information concerning (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person and the community that would be posed by the person's release. *See United States v. Coleman,* 777 F.2d 888, 892 (3d Cir.1985). *See also* 18 U.S.C. § 3142(g). In this case, the government does not contend that the defendants will flee. Thus, the focus is on the safety of the community.

In evaluating the nature and circumstances of the offense charged and the weight of the evidence, the district court found, *inter alia,* that the government has demonstrated "that the three defendants under detention use the [R]oofers' [U]nion to squeeze money out of roofing contractors by violence and intimidation," and that "[t]he tape recorded conversations demonstrate that the Roofers' Union has conducted its affairs through a pattern of violence." Although the court stated that it was not prejudging the claims of the defense that the violence was used to achieve legitimate union objectives, it stated that the factual underpinnings of such a claim "on the present record appear weak."

With respect to the government's contention that these defendants would obstruct justice and intimidate witnesses, the court found that the evidence "demonstrates a clear intention to 'fix' state court judges" but that there was only a weak showing of intimidation or threats to witnesses, which arose out of a motor vehicle accident involving Medina that was unrelated to the union activities.

In considering the history and characteristics of the defendants, the court noted that Traitz and Osborn had never been convicted of any crime, and that Medina had twice been convicted of armed bank robbery.[1]

---

1. The district court also stated that Medina was convicted of assault and related charges in state

court in 1986 for which he received probation,

Finally, in considering the nature and seriousness of the danger to any person or the community that would be posed by the defendants' release, the district court concluded that the removal of the defendants from union activities combined with the other conditions in its orders provide reasonable assurance that the pattern of violence against roofing contractors and others will cease, and provide reasonable assurances of the safety of witnesses and others. The court reminded the government that it can and indeed "should move to revoke defendants' bail" if the circumstances change.[2]

■ On appeal from the district court's decision to detain a defendant before trial and to release a defendant, the court of appeals has an obligation to make an independent determination on the application of the government for detention, although the reasons given by the trial judge are entitled to respectful consideration. *United States v. Coleman,* 777 F.2d at 891. In effect, the district court ruled that the conditions of release that it imposed adequately protect the community and any persons therein from any danger posed by these defendants. Exercising our independent determination, we conclude that the district court's order should be affirmed.

In enacting the Bail Reform Act of 1984, Congress substantially altered the preceding practice under which assurance of the defendant's presence at trial was the only factor to be considered in detention determinations before trial. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 5, reprinted in 1984 U.S.Code Cong. & Admin.News at 3187. However, while enlarging the circumstances and basis for pretrial detention,[3] Congress also made clear that such detention was for only a "limited group" of offenders to whom pretrial detention was applicable, i.e. the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." *Id.* at 6–7, reprinted in 1984 U.S.Code Cong. & Admin.News at 3189.

In the statute, Congress indicated those cases for which pretrial detention is particularly appropriate by providing for a presumption of dangerousness in certain situations. *See* 18 U.S.C. § 3142(e). In other cases, release on conditions remains the norm and the government must prove, by clear and convincing evidence, that no condition or combination will assure the safety of the community. 18 U.S.C. § 3142(f).

■ Here, the government concedes that it does not have the benefit of the statutory presumption of dangerousness. *Compare United States v. Perry,* 788 F.2d 100, 108 (3d Cir.1986). It argues, however, that the conditions are inadequate and contends that imposing house arrest is unprecedented and unsupported by the statute. We note, however, that one of the conditions expressly specified in the statute is that the defendant "abide by specified restrictions on his personal associations, place of abode, or travel," 18 U.S.C. § 3142(c)(2)(D), and therefore conclude that house arrest is a statutorily permissible condition.

Each case, of course, is *sui generis,* and must be decided on the basis of the particular record adduced. Although the government refers us to earlier cases decided by this court and others, we believe that there are significant differentiating factors. In *United States v. Delker,* 757 F.2d 1390,

---

but we cannot confirm that conviction on the basis of the limited record before us.

**2.** We note that the district court stayed its orders pending determination of an appeal, scrupulously following this court's suggestion in *United States v. Coleman,* 777 F.2d at 891, that a reasonable time be allotted following the district court's order to permit us to review the appeal papers.

**3.** The Supreme Court has granted certiorari on some questions relating to the constitutionality of pretrial detention in *United States v. Salerno,* 794 F.2d 64 (2d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 397, 93 L.Ed.2d 351 (1986). No constitutional issue is raised before us.

1400 (3d Cir.1985), there was substantial testimony that Delker had already threatened potential witnesses several times. In *United States v. Coleman*, 777 F.2d at 892–93, Coleman, who had a history of 7 criminal convictions including distribution of heroin, was charged with participating in a conspiracy resulting in the death of a government witness and the evidence was sufficient to convince 6 jurors at his first trial of his guilt beyond a reasonable doubt. In *United States v. Colombo*, 777 F.2d 96, 97 (2d Cir.1985), the indictment charged that Colombo operated a criminal enterprise which committed crimes such as murder, robbery, narcotics violations, arson, extortion, threats, assaults, illegal gambling, bribery, interstate theft, transportation of stolen goods, and mail/wire fraud.

█ We do not minimize the seriousness of the charges of widespread illegal activities against these defendants, nor the strength of the government's evidence presented by it in support of its application for detention. However, the focus of the Bail Reform Act is on whether the conditions or combination of conditions will reasonably assure the safety of the community. The government has produced no evidence of a threat to any witness in connection with the crimes charged in the indictment, and its evidence as to threats in the unrelated incident arising out of Medina's automobile accident was "weak." While "house arrest" may not, in and of itself always provide the requisite assurance, we are satisfied that, after according respectful consideration to the reasons given by the trial judge, and based on the record produced by the government, the district court did not err in determining that house arrest combined with the other conditions of release, including in particular the requirement that defendants cease all connection with the Roofers' Union through which and on whose behalf many of the crimes of violence were allegedly committed, would provide the reasonable assurance required by the statute of the safety of the community during the period before the trial is concluded.

For the foregoing reasons, we will affirm the orders of the district court. The mandate will issue forthwith.

## A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting in part.

The Bail Reform Act of 1984 has brought extensive changes to the pretrial bail process in certain noncapital criminal cases. It has, as the majority notes, "substantially altered the preceding practice under which assurance of the defendant's presence at trial was the only factor to be considered in detention determination before trial." Maj. at 325.

The Court of Appeals for the Second Circuit, in an opinion written by Judge Kearse, has concluded—quite persuasively, in my view—that the authorization of pretrial detention, *see* 18 U.S.C. § 3142(e) (Supp.III 1985), is "repugnant to the concept of substantive due process [that] ... prohibits the total deprivation of liberty simply as a means of preventing future crimes."[1] *United States v. Salerno*, 794 F.2d 64, 71–72 (2d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 397, 93 L.Ed.2d 351 (1986). In this Circuit, however, we are bound by our prior decisions rejecting constitutional attacks on the Bail Reform Act. *See United States v. Perry*, 788 F.2d 100 (3d Cir.1986); *United States v. Accetturo*, 783 F.2d 382 (3d Cir.1986); *United States v. Delker*, 757 F.2d 1390 (3d Cir.1985). At least until the Supreme Court reaches a decision in the *Salerno* case, our task is to put aside our individual reservations about the Act's validity and apply its precise terms to defendants like Messrs. Traitz, Medina and Osborne.

In both *Salerno* and the instant case, the government's theory has been that "the

---

1. I "recognize that pretrial detention may be validly imposed when substantial evidence indicates that a defendant, if released, would [tamper with or intimidate witnesses or jurors, or would flee and not appear for trial]." *United States v. Salerno*, 794 F.2d 64, 71 (2d Cir.1986). The constitutional problem with the Bail Reform Act is that it goes so much further, authorizing "[p]retrial detention to prevent future crimes against society at large." *Id.* at 73.

defendants would if released carry on 'business as usual' notwithstanding any release conditions, and that business as usual involves threats and crimes of violence." 794 F.2d at 71. The record in this case establishes clearly that, particularly for Mr. Traitz and Mr. Medina,[2] their "business as usual" involves threats and crimes of violence. Their alleged conduct has been so egregious, so truly bereft of moral values and so disrespectful of the law that it defies my imagination to conceive that, for example, confining Traitz to his suburban estate will change his long term practices of abuse, threats and violence whenever he finds them to be tactically advantageous. If there are anywhere persons whose "release ... will endanger the safety of any other person or the community," 18 U.S.C. § 3142(b) (Supp.III 1985), Traitz and Medina fit perfectly that Congressional description.[3] They personify that "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S.Rep. No. 225, 98th Cong.. 2d Sess. 6–7, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 3189; Maj. at 325.

I concede that these appeals involve, in many respects, close judgment calls. Judges Sloviter and Katz have, in their characteristic fashion, written thoughtful opinions. Nevertheless, I believe that releasing Traitz and Medina eviscerates the intent of Congress. The majority stresses that *United States v. Delker*, 757 F.2d 1390 (3d Cir.1985), where we affirmed a pretrial detention order, was different because "there was substantial testimony

that Delker had already threatened potential witnesses several times." Maj. at 326. I do not believe that the only persons who are subject to pretrial detention are those bestial individuals who have in fact killed others or who have in the most unequivocal language threatened to terrorize those who have been officially designated as "witnesses" in pending federal court cases. As I interpret the Bail Reform Act, Congress swept much more widely when, in authorizing the pretrial detention of "dangerous" individuals, it sought to protect "the safety of any other person and the community," 18 U.S.C. § 3142(f) (Supp.III 1985), from defendants who have, as in this case, been indicted for crimes of violence. While § 3142(f)(2) makes reference to threatening a prospective witness or juror, that conduct is not a synonym or the equivalent of the statutory language that is concerned to insure the safety of "other person(s) in the community." The statute's concern thus encompasses a broad variety of persons in addition to prospective witnesses. On the more general level of danger to the community, there are several remarkable similarities here to a prior case under the Act, where our Court noted that:

> [o]ur independent analysis finds clear and convincing evidence that Delker[, the defendant,] poses a danger to the community within the meaning of the Bail Reform Act of 1984. He is charged with several serious offenses; the indictment alleges that he was part of a group that dominated a union local through the systematic use of force, violence, vandalism, and physical and economic intimidation. The Hobbs Act count results from Delker's alleged beating of and the use of a death threat in an attempt to extort money from a painting contractor. The Act

---

**2.** As to appellee Mr. Osborne, I do not dissent from the majority's affirmation of the district court order. Although the record alleges that Osborne has personally committed a number of acts of violence, his role in the alleged crimes of the Roofer's Union appears to have been limited to that of a soldier taking orders. Unlike appellees Traitz and Medina, Osborne is not alleged to have been a decisionmaker or even to have given orders that any crimes be committed. He also, unlike Medina, has no criminal record. I

am thus persuaded that the safety of the community and the well-being of prospective witnesses in this case will be insured by the bail conditions that Judge Katz imposed on Osborne.

**3.** I have included in an appendix portions of the trial court's findings which confirm my view. In fact, as I read the trial judge's opinion, it understates the magnitude of violence that is Traitz's and Medina's "stock in trade."

provides for consideration of the nature and seriousness of the offense charged with specific emphasis upon crimes of violence. *See* S.Rep. No. 225, 98th Cong., 1st Sess. at 23, *reprinted in* 1984 U.S.Code Cong. & Ad.News at 26 (Supp. 9A). This first factor thus supports the district court's detention decision.

Next, despite appellant's protestation that he is not a "career offender," the record reveals that Delker has two Pennsylvania convictions for assault and battery in 1961, and a Pennsylvania conviction for robbery by assault and force in 1964. He also has a 1975 arrest for assault and resisting arrest, which was subsequently reduced to disorderly conduct at the time of a guilty plea. In 1977, Delker was arrested on criminal mischief charges. The Act specifically provides for consideration of prior arrests in the release decision. S.Rep. No. 225, 98th Cong., 1st Sess. at 23 n. 66, *reprinted in* 1984 U.S.Code Cong. & Ad. News at 26 n. 66 (Supp.9A), and the legislative history of the Act records Congress' belief that there is a "significant correlation" between prior criminal history and pretrial rearrest. *Id.* at n. 68.

*Delker*, 757 F.2d at 1400. Certainly Mr. Delker's criminal record was not as malevolent as is Medina's, and, except for direct personal threats to prospective witnesses, Traitz could pass as Delker's identical twin as to his conduct in the union.[4]

In their brief, counsel for Mr. Traitz complain about some of the conditions that he has had to tolerate in prison. *See* Brief of Appellee at 31. They assert that the government's fears that the conditions of release will not insure the safety of the community are "groundless" because "Mr.

Traitz's movements have been restricted to horseback rides around his three acre farm." *Id.* at 26. Given the existence of the Bail Reform Act and the preventive detention it authorizes, however, Traitz's counsel's argument fundamentally misperceives the parity of our law. As Justice Harlan wrote ninety years ago, "in the eyes of the law, there is in this country no superior, dominant, ruling class of citizens. *There is no caste here. Our Constitution ... neither knows nor tolerates classes among citizens.* In respect of civil rights, all citizens are equal before the law." *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) (emphasis added).

Under our Constitution and the Bail Reform Act, Mr. Traitz deserves no special class treatment. He is no more entitled to liberty because he is an equestrian devotee who desires to retreat from prison to his Montgomery County farm, than would be an "underprivileged" poor defendant, who had been involved in similar systematic violent conduct but resides in a public housing project notorious for drug trafficking and other criminal activities. It is my hunch that, under the statute as it is now being applied, the latter defendant would not be freed, and, in my view, neither should Mr. Traitz nor Mr. Medina. For these reasons, I respectfully dissent.

*Appendix*

The district court made the following factual findings:

The government has demonstrated that the three defendants under detention used the roofers' union to squeeze money out of roofing contractors by violence and intimidation. The tape recorded con-

---

**4.** Counsel for Traitz misperceive the intent of the statute when they stress the following:

When cross-examined, it was established that although the taped incidents sounded truly horrible, there was no evidence that any of the alleged victims had ever been hospitalized or even received medical treatment.

Brief of Appellee at 7. Dangerousness to the community does not require a trail of broken

bones, hospitalized bodies, or corpses. As Judge Adams noted in *Delker*, "[t]he legislative history ... specifies that the concept of a defendant's dangerousness as used in the Act is to 'be given a broader construction than merely danger of harm involving physical violence.'" *Delker*, 757 F.2d at 1393 (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 12–13, *reprinted in* 1984 U.S.Code Cong. & Admin. News 1, 15 (Supp.9A)).

versations demonstrate that the Roofers Union has conducted its affairs through a pattern of violence. On October 30, 1985, Stephen Traitz, Jr., Robert Medina, and another defendant discussed an individual who worked for Peerless Roofing. When Medina advised Traitz that the individual had not followed certain instructions, Traitz instructed Medina to have the individual beaten. Traitz advised Medina not to get involved personally in the beating. Traitz instructed Medina to get a "good gang" together and "give it to 'em good." Traitz instructed Medina that a "good punch in the mouth will do him a world of good."

*United States v. Traitz*, 646 F.Supp. 1086, 1088 (E.D.Pa.1986).

\* \* \* \* \* \*

Traitz stated, "The first time I see him at one of them functions, I'll get Joey or Schoenberger to beat the fuckin' balls off him. Like I did with the two metal men, like I did with the ironworker, like I did with the bricklayer. That's how I do it. They're scared to fuckin' death of me because that's how the fuckin' operate." Other conversations are proffered to indicate that on October 17, 1985, Stephen Traitz, Jr. told another defendant to summon a roofer to the union offices for a union infraction and to let defendant Joseph Traitz "give him a smack." On October 23, 1985, Traitz gave permission to a defendant to assault a roofer over a personal matter, according to another proffer in the government's Memorandum. Finally, on November 7, 1985, the government's Memorandum proffers that Traitz told another defendant what he (Traitz) tells other business agents to tell contractors to establish superiority. Specifically, Traitz stated, "If you fuck me, I'll beat you the fuck-up. Don't mess with me ... I'll beat you up." Stephen Traitz, Jr. does not perform the acts of violence personally. Rather, this task falls on one or more of his subordinates. The recorded conversation of October 10, 1985 is replete with evidence of this; it also suggests some connection between the union and a reputed organized crime employee.

In an October 3, 1985, tape recording, a contractor who tried to leave a confrontation at the union offices was forced to sit down for further intimidation. On November 21, 1985, another contractor was at the union offices for a confrontation. In that instance, Robert Medina was intercepted yelling "smack him in the mouth. Smack him again ... smack him again." This was followed by slapping noises. The tape recording established that Mark Osborne was the individual who actually assaulted the contractor. Similarly, there is a tape recording from a November 26, 1985 assault of a roofer. In that confrontation, Mark Osborne slapped a roofer in the union offices for working on weekends. In yet another instance on September 26, 1985, Robert Medina and others confronted a contractor and accused him of underreporting the number of hours worked. In this confrontation, Robert Medina screamed and yelled at the contractor. At one point, the contractor is slapped on the side of the head by another defendant. At the end of this confrontation directed by Robert Medina, another defendant told the contractor, "You're lucky you're getting away with just a slap in the head; next time it won't be as easy."

*Id.* at 1088–1089 (original ellipses).